UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| YONA INVESTMENT GROUP, | ) | Case No. 5:19-CV-01842-CEH |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | CARMEN E. HENDERSON |
| vs. | ) | |
| | ) | |
| REVILO'S, LLC, *et al.* | ) | |
| | ) | **MEMORANDUM ORDER** |
| Defendants. | ) | **AND OPINION** |

**I.     Introduction**

This matter is before the Court on cross-motions for summary judgment by Plaintiff Yona Investment Group, LLC, and Defendant John Dean Harper. (ECF Nos. 32, 51). For the following reasons, the Court GRANTS summary judgment to Harper on claims for relief nine, ten, and eleven. The Court DENIES summary judgment to Yona on claims for relief nine, ten, and eleven.

**II.    Background**

**A.     The Investment**

This case concerns events that began in July 2018 and continued for the next few months. Yona, a company that invests in real estate and other financial instruments, sought an investment venture. (ECF No. 51-2 at ¶ 1). Michael Weiss, an attorney practicing bankruptcy reorganization and litigation, financial restructuring, and commercial law, represented Yona in its venture. (ECF No. 48-1 at ¶¶ 2-4). Yona's principal, Shahram "Sean" Elyaszadeh, a longtime mortgage broker and banker, "was introduced to a potential investment with Revilo's, LLC, … [and] believed it may be a good fit as an investment opportunity…" for Yona. (ECF No. 51-2 at ¶¶ 5-6). Revilo's, behind its principal, Samuel Oliver, was a limited liability company organized under Ohio law. (ECF No. 1 at ¶¶ 2-3). Revilo's offered to Yona an exciting investment opportunity: If Yona

1

invested $450,000.00 ("the Deposit") in Revilo's opportunity, then, within 30 days, Revilo's would issue to Yona a $20,000,000 funding allowance (with $19,000,000 "net" to Yona). (ECF No. 1-1 at 2).

Yona and Revilo's entered into a Capital Partnership Agreement ("CPA") under those terms on or about July 2, 2018. (ECF No. 1-1 at 2). The CPA explained that Yona would wire the Deposit directly to another entity, Freedom Global, Inc. ("FGI"), that was not a party to the CPA. (ECF No. 1-1 at 2). A Lord Samson Supreme served as FGI's Chairman and CEO. (ECF No. 32-2 at 20). The CPA would incept when Yona disbursed the full Deposit to FGI. (ECF No. 1-1 at 2). Revilo's would then have 30 days to perform. (ECF No. 1-1 at 2-3). Revilo's would merely "facilitate the transactions"; FGI would transact the business. (ECF No. 1-1 at 2).

### B.    The Escrow Agreement

Yona and Revilo's agreed to include in the CPA two additional safeguards over the Deposit: (1) a commercial insurance policy covering the Deposit; and (2) an escrow arrangement tied to the insurance policy, whereby an escrow agent (with whom Yona would place the Deposit) would release the Deposit to FGI only after the escrow conditions had been satisfied. (ECF No. 1-1 at 2-3; ECF No. 1-2 at 2). At Oliver's suggestion, Yona chose John Dean Harper, a Nevada-based attorney who had attempted to work with Oliver in the past, as the escrow agent. Yona and Harper memorialized their understanding in an escrow agreement, executing it on July 14, 2018 (the "Escrow Agreement"). (ECF No. 1-2). Neither Revilo's nor FGI were parties to the Escrow Agreement. Weiss drafted the Escrow Agreement on Harper's behalf, then printed it on Harper's letterhead. (ECF No. 1-2; ECF No. 51 at 3).

Under the Escrow Agreement's terms, Harper was to first receive the Deposit into Harper's client trust account. (ECF No. 1-2 at 2). Upon receiving the Deposit, Harper would wire to Revilo's

$150,000 "to secure an insurance policy … to cover the risk of loss" of the Deposit. (ECF No. 1-2 at 2). Revilo's would then acquire the insurance policy for Yona. (ECF No. 1-1 at 2). While Harper played no role in acquiring the insurance policy, the Escrow Agreement described it as having six key components. The policy would

- identify Yona as the insured and loss payee;

- identify Capsicum RE as the insurer, unless Yona consented in writing to using a different insurer;

- provide that Revilo's failure to return in full to Yona the Deposit within 30 days would constitute an insurable loss;

- require the insurer to pay out to Yona the Deposit within 90 days of Revilo's not returning the Deposit;

- limit the loss to the Deposit; and

- provide that Yona is not required to mitigate its damages other than by demanding payment under the insurance policy.

(ECF No. 1-2 at 2). The Escrow Agreement then expressed Harper's final duty as escrow agent: disbursing the remaining $300,000. His performance was tied to a condition precedent:

> Upon the receipt of an authenticated insurance policy by [Harper] …, [Elyaszadeh for Yona] …, and Yona's counsel …, [Harper] will release the remaining $300,000 USD of the Deposit from [his] trust account… [It] will be wire transferred to FGI Freedom Global Inc. to participate in [the investment opportunity] … All transfers shall be minus attorney paymaster fees and wire costs.

(ECF No. 1-2 at 2-3). Thus, only after Harper, Elyaszadeh, and Weiss each had received the insurance policy could Harper disburse the remaining $300,000.

### C.    Disbursing the Deposit

The next week saw a flurry of activity. Yona wired the Deposit to Harper's trust account on July 18. (ECF No. 32 at 4). Harper wired the initial $150,000 to Revilo's that day and notified Yona of the transfer. (ECF No. 32-1 at 34). The next day, Djehuty Se Hotep, another party to the

transaction (of an unrelated other entity),[1] DSH Worldwide Development, emailed Elyaszadeh, Weiss, Harper, and others to tell them that the insurance premium "ha[d] been paid and the policy will be issued between Monday [July 23] and Wednesday [July 25]. Everything is moving forward quite nicely." (ECF No. 32-3 at 19). On July 20, Se Hotep emailed the group again, this time recapping his recent conversations with Elyaszadeh, explaining that Yona could expect to access its $20,000,000 funding allowance in a mere 15 days—half of the time contemplated under the CPA. (ECF No. 32-3 at 17).

On July 24, Oliver emailed the group to explain that the insurance policy underwriting "went great." (ECF No. 32-3 at 16). But it was early in the transaction, so Oliver told "everybody [to] just relax," as Oliver would "contact [the group] when the insurance policy has been delivered[,] not the other way around[. P]lease refrain from calling and bug[g]ing the escrow attorney…" (ECF No. 32-3 at 16). In closing, he reiterated that "everything is going great," which was a common theme in an earlier email from someone named Peter (last name unknown), another participant who purported to know the ins and outs of the transaction. (ECF No. 32-3 at 16).

The excitement boiled over on July 26. That day, the various parties to the transaction held a WhatsApp call in which both Harper and Weiss participated. (ECF No. 32 at 5; ECF No. 51-1 at ¶ 9). The specifics of the call are uncertain; indeed, Harper admits that the call quality was poor and that people were talking over one another. (ECF No. 51 at 6 (citing Harper's deposition)). Still, Harper left the meeting with the impression that he was to wire $25,000 of the remaining $300,000 after the call. (ECF No. 32-2 at 21). Harper then emailed Weiss to confirm what he had heard on the call, stating, "Per our conversation of a few minutes ago, you are going to return instructions to me regarding a $25,000 wire from the monies [that] I am holding in my trust

---

[1] The parties do not address Se Hotep's role in the transaction.

4

account." (ECF No. 32-2 at 21). Two minutes later, Weiss emailed back, "This confirms your authority to wire the funds under the agreement with Revilo's." (ECF No 32-2 at 21). Harper then reiterated to the whole group, but directed to Weiss, that "[t]he phone connection was not great[;] as such, [he] did not hear the exact amount and where [he] was to wire the funds. Please forward wire instructions and confirm the amount." (ECF No. 32-2 at 20).

At that point, the conversation quickly grew frenetic.[2] Samson Supreme, FGI's Chairman and CEO, chimed in for the first time[3] just a few minutes later, writing, "[T]hank you for the Speedy [*sic*] response. Please see the attached FGI bank details. And transfer the 300K with no delay." (ECF No. 32-2 at 20). Harper quickly replied, "Once … Weiss OK's [*sic*] it, I will head to the bank." (ECF No. 32-2 at 20). Samson Supreme shot back, "I just re-emailed [Weiss's] … approval for you to do just that." (ECF No. 32-2 at 19). Harper didn't miss a beat, replying, "I appreciate your response. I had heard a figure of $25,000. As I stated[,] the connection was bad. Once [Weiss] … confirms the amount, I am set to go." (ECF No. 32-2 at 19). Samson Supreme responded immediately with the basic terms of the deal: "The 300K is a deposit that actuates our banking[, w]hich is the transaction at hand. If there are any incidental fees to be deducted from that 300K prior to [the funds] coming to my account[,] then please deduct them and send the balance." (ECF No. 32-2 at 19). Eight minutes later, Weiss returned to the conversation, writing back only one word: "Confirmed." (ECF No. 32-2 at 19).

---

[2] It is unclear from the record whether Harper emailed only the one who answered the email or the group all together during the subsequent email exchange, but the Court infers from the various responses that Harper included in the email thread at least Weiss and Samson Supreme.

[3] Although Se Hotep, Oliver, and Weiss had included Samson Supreme in many of the emails before that day (at Supreme@FreedomGlobalInc.com), it does not appear that Samson Supreme had responded to or initiated any emails before July 26, 2018.

5

Samson Supreme then asked Harper to "provide a copy of the FED wire transfer receipt (to [his] email for [FGI's] banker)." (ECF No. 32-2 at 19). Nearly an hour passed before Harper's next response: "See attached."[4] (ECF No. 32-2 at 15). Two minutes later, Samson Supreme replied "[r]eceived and acknowledged[,] thank you…" (ECF No. 32-2 at 15). Harper, Yona, and Weiss had not received yet an authenticated insurance policy.

### D.  Post-Disbursement Communications

On July 30—four days after Harper disbursed the remaining $300,000—Elyaszadeh emailed Se Hotep, asking, "What is the current statu[s] of the insurance policy and insurance binder securing the funds???? [P]lease advise." (ECF No. 32-2 at 10). Se Hotep responded shortly thereafter, "[I j]ust spoke to Peter and he informed me that Oliver is expecting the policy today," but that he would let Oliver provide a more specific answer. (ECF No. 32-2 at 10). Only a few minutes later, though, Se Hotep wrote again—this time to the whole group—saying that he "just spoke to [Oliver]. The insurance agent stated to [Oliver] that [Oliver] should have a copy of the policy [that day, July 30]." (ECF No. 32-2 at 10). Se Hotep concluded by saying that "[w]e will call as soon as the policy arrives." (ECF No. 32-2 at 10).

Weiss emailed Se Hotep to ask for an update that evening. (ECF No. 32-2 at 9). Se Hotep responded that he had "just got off the phone with Peter[, who] indicated that [Oliver] spoke with the underwriter and that the policy will be issued tomorrow[, July 31]. However, he would like to reassure you both this evening … if you are available." (ECF No. 32-2 at 9). Weiss responded, "Of course we are [available]. Please text a call in [*sic*]." (ECF No. 32-2 at 9). Elyaszadeh asked to join the call, too. (ECF No. 32-2 at 9). The record does not confirm that that call occurred;

---

[4] It is also unclear from the record whether Weiss received this particular email, as Weiss never responds to it. Thus, the Court treats it as though Weiss (and, thus, Yona) did not receive it.

however, it does show that Yona's concerns over the insurance policy were not fully satisfied, as Elyaszadeh emailed the group the next day, stating, "I have been waiting anxiously all day to receive and review the insurance policy … please advise" of its status. (ECF No. 32-2 at 9).

On August 8, Weiss emailed the group asking for "complete contact info[,] including physical address, telephone (office and cell)[,] and … company[] name" for someone named Andrew (last name unknown). (ECF No. 32-2 at 7). Harper emailed Oliver shortly thereafter to ask "[i]s everything ok?" (ECF No. 32-2 at 7). Oliver emailed back to Weiss and others that afternoon: "[A]s I said earlier when we spoke before you sent [your earlier] email[,] I updated you on my calling Andrew … regarding the insurance[.] I also reached out to [Elyaszadeh] on the insurance and have not heard back as of yet." (ECF No. 32-2 at 5). He also stated that "[e]verything is going well[,] and we are on track with the pay out [*sic*] schedule…"[5] (ECF No. 32-2 at 5).

Weiss then emailed Harper a formal letter on August 20. Weiss quoted the Escrow Agreement and outlined the basic facts of the transaction that had occurred before July 26. (ECF No. 32-2 at 3). Weiss noted that Yona had "requested that [Harper] or Revilo['s] provide [Yona] with proof of insurance[, but a]t this juncture, Yona has only received the following 'proof of insurance'—an unsigned 'Declaration FRG/Yona/200.18/07/25,' [which] does not mention either Arthur Gallagher or Capsicum [as the insurer] and a document entitled 'Risk Details—Barents Re,' which makes no mention of Arthur Gallagher or Capsicum." (ECF No. 32-2 at 3). Weiss also noted that the Risk Details document "is a 'non-binding indication,' *i.e.*, a term sheet."[6] (ECF No.

---

[5] Under the CPA, Revilo's could be "on track with the pay[]out schedule" only after Yona had fully invested in the venture, i.e., after Harper had fully released the Deposit. (ECF No. 1-2 at 2-3).

[6] Although neither party explains it in detail, it appears that Yona received information concerning a purported insurance policy earlier in the transaction.

32-2 at 3). Finally, Weiss stated that Yona "view[s] neither document as being acceptable proof of insurance in the form [] described in" the Escrow Agreement. (ECF No. 32-2 at 3). Weiss requested that Harper provide:

- A declaration page from the insurer signed by a suitable person indicating that Yona is insured or [a] loss payee in the manner described in [the Escrow Agreement];

- A copy of the policy signed by the insurer;

- An accounting of all transfers made from [Harper's client trust fund] … on behalf of Yona in connection with the Revilo['s] transaction; [and,]

- Copies of all checks or wire advices for all payments made from [Harper's] account for Yona in connection with the Revilo['s] transaction.

(ECF No. 32-2 at 3-4). Weiss asked Harper to respond in writing. (ECF No. 32-2 at 4).

Rather than write back, Harper forwarded Weiss's email to Oliver without comment. (ECF No. 32-2 at 3). Weiss followed up with Harper by email the next afternoon, mentioning that he had left Harper a voicemail that morning, too, but that he had not heard from Harper yet. (ECF No. 32-2 at 1). Weiss noted that "Yona is very concerned about the matters raised in the [prior day's] letter…" (ECF No. 32-2 at 1). Harper again forwarded Weiss's email to Oliver, stating, "This is getting quite concerning." (ECF No. 32-2 at 1). He asked Oliver to respond to Weiss in writing, "[o]therwise, [Harper is] going to have to respond." (ECF No. 32-2 at 1). Harper responded on August 29. He attached the documents that he had. One of the documents showed the dates and amounts[7] of Harper's disbursements to Revilo's and FGI. (ECF Nos. 32-1 at 34

---

[7] The exhibit reflects that Harper disbursed only $299,850 on July 27, 2018. That is likely so because the transferring or receiving bank assessed a wire-transfer fee; but the particular amount or reason is immaterial to this matter.

On August 23—before Harper replied to Weiss—Weiss emailed Oliver, copying Se Hotep and Harper. Weiss referenced a conversation with Oliver that had occurred that day and mentioned "a misunderstanding that [Yona] want[ed] to clarify" concerning what the insurance policy was to cover. (ECF No. 32-1 at 12). Weiss quoted the portion of the Escrow Agreement that described the insurance policy, then stated that "Yona understood [those details] to mean that if the monetization [under the CPA] did not occur within 30 banking days from the inception of the [CPA] …, [then] Revilo['s] would return Yona's deposit … [or] if Revilo['s] did not return the deposit within 45 days, the insurance would cover the deposit." (ECF No. 32-1 at 12). Weiss acknowledged that Oliver had represented that Revilo's would "gladly return the deposit if the funding does not occur in a timely fashion," but he also openly worried about "the return of the deposit [under the purported insurance policy] if for some reason Revilo['s] cannot" return it. (ECF No. 32-1 at 12). Weiss then directly acknowledged that the CPA had incepted and that Yona expected Revilo's to perform: "We have assumed that it [incepted] … on July 17, 2018[,] when Yona sent its funds to [H]arper. If it [incepted on] … another date, [then] please advise [Yona of the same] and explain." (ECF No. 32-1 at 12).

Separately on August 23, Weiss corresponded directly with Paul Kanes, whose role in the transaction was apparently unknown until that time to Weiss. (ECF No. 32-1 at 31). Weiss copied on the thread Harper, Se Hotep, and Oliver, noting that Kanes had "tak[en] the time to explain the insurance situation … [to Oliver] and [Weiss]" on August 22. (ECF No. 32-1 at 31). Weiss noted that "[i]t was quite reassuring to hear that the insurance [was] in place for the transaction." (ECF No. 32-1 at 31). Yet, Weiss indicated that the supposed "proof of insurance that Yona now has may not cover" what Yona anticipated in the Escrow Agreement or the CPA. (ECF No. 32-1 at 31). Indeed, Yona wondered how the policy "assures … that the insurance is out there to cover

Yona if Revilo['s] fails to return Yona's deposit." (ECF No. 32-1 at 31). Weiss asked Kanes to

"provide Yona with an explanation of assurance that the [existing policy] … will cover the"

Deposit. (ECF No. 32-1 at 31).

On September 4, Weiss emailed Oliver and Samson Supreme, copying Harper, to discuss

the status of the transaction. (ECF No. 32-1 at 28). There, Weiss wrote that

> unless we receive documentary proof that the funds taken from Mr.
> Harper's account were in fact used to pay for the insurance
> immediately, [then] Yona will treat the [CPA] as terminated and
> insist on immediate payment of the funds deposited by Yona. If said
> funds are not returned within the time specified in the [CPA], we
> will take all necessary steps to recover them. It is Yona's hope that
> none of these steps will be necessary.
>
> As we discussed, [Yona] do[es] not count the first day [of
> disbursement for the 30-day performance clock.] … Thursday[,
> September 7, 2018] is the 30th banking day since Yona's funds were
> released from Mr. Harper's trust account on July 26, 2018. Under
> [the CPA] …, Yona has the right to terminate its involvement and
> demand return of the $450,000 deposit at that time.

(ECF No. 32-1 at 28).

Weiss continued to chase the insurance policy's loose ends with Kanes over the next few

weeks. Ultimately, Weiss confirmed that an insurance policy existed, but that it was listed under

Kanes's name and not yet effective or funded. (ECF No. 32-1 at 3-6). The policy apparently

covered "[Kanes's] internal process" and would not start until Kanes received "the insurable

interest." (ECF No. 32-1 at 4). Kanes told Yona to "sit tight [and] push Samson[,] not [Kanes] or

[Oliver] to deliver[. W]hen [Kanes] receive[s] the funds for [his] process[, the Deposit] will be

fully covered." (ECF No. 32-1 at 4).

Finally, Weiss wrote to Oliver, Harper, Samson Supreme, Se Hotep, and others on

September 25 to express Yona's "feel[ing] very much in the dark" on the transaction's status. (ECF

No. 32-1 at 1). Weiss noted that "[t]he transaction was funded about 10 weeks ago and the time to

10

perform ha[d] passed by over two weeks." (ECF No. 32-1 at 1). Concerning the Deposit, Weiss

noted that it doubted that the purported insurance product would yield a payout. (ECF No. 32-1 at

1). In conclusion, Weiss wrote, "If no insurance was purchased for the first part of the transaction

with the funds in [Harper]'s trust account, then [Yona] would expect that the $150,000 wired from

that account to Revilo['s on July 18] for that purpose would be either returned to [Harper]'s

account or to [Yona], immediately." (ECF No. 32-1 at 1). Neither Yona or Harper provided

evidence of either Oliver's or Samson Supreme's response—if any response was received.

### III.    Procedural Background

Yona filed this action on August 13, 2019, against Harper and other defendants. (ECF No.

1). Yona's ninth (negligence), tenth (breach of contract), and eleventh (breach of fiduciary duty)

claims for relief were against Harper and only Harper. (ECF No. 1 at 11-13). Harper answered

Yona's complaint on October 8, 2019, asserting a counterclaim against Yona. (ECF No. 4). Yona

moved to dismiss Harper's counterclaim on October 29, 2019. (ECF No. 6). Yona and Harper

consented to Magistrate Judge Limbert's jurisdiction under 28 U.S.C. § 636(c) on February 6,

2020. (ECF No. 13). The Court granted Yona's motion to dismiss Harper's counterclaim on April

3, 2020. (ECF No. 19). After Magistrate Judge Limbert retired and the case reverted to Judge

Adams, Yona and Harper consented to the undersigned's jurisdiction under 28 U.S.C. § 636(c) on

July 17, 2020. (ECF No. 21 and subsequent order).

Harper moved for summary judgment on all claims of relief on September 15, 2020. (ECF

No. 32). Harper attached "Exhibit A," which he described as "96 pages[8] … [going] backward in

chronology with the emails that [Harper] … was a party to" in the transaction. (ECF No. 32 at 3).

---

[8] Harper cites to his Exhibit A as a single document, but Exhibit A was filed as three
separate documents: ECF Nos. 32-1 (40 pages); 32-2 (26 pages); and 32-3 (33 pages).

Yona moved to postpone consideration of Harper's motion for summary judgment on October 15, 2020, to allow more time for additional discovery. (ECF No. 38). Harper opposed the motion ten days later. (ECF No. 39). The Court deferred consideration of Harper's motion until after the parties completed discovery. (October 30, 2020 Order). The Court entered an amended case management order on November 24, 2020, setting dates by which Yona would respond to Harper's motion for summary judgment and any dispositive motion by Plaintiff. (ECF No. 41). Yona timely opposed Harper's motion for summary judgment on January 4, 2021. (ECF No. 48). Harper timely replied on January 18. (ECF No. 50).

For its part, Yona moved for summary judgment on all claims for relief on January 18, 2021. (ECF No. 51). Yona attached affidavits from Weiss (ECF No. 51-1) and Elyaszadeh. (ECF No. 51-2). Harper timely opposed Yona's motion for summary judgment on February 15. (ECF No. 53). Yona timely replied on March 1. (ECF No. 54).

## IV.    Standard of Review

Federal Rule of Civil Procedure 56(a) lays out the standard for summary judgment motions. It provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A party asserting that there is no genuine dispute as to any material fact or that a fact is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In reviewing summary judgment motions, the court views the evidence in the light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 153 (1970); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943–44 (6th Cir. 1990). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Tokmenko v. MetroHealth System*, 488 F. Supp. 3d 571, 576 (N.D. Ohio 2020) ("A dispute about a fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."). Determining whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most cases, the court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Anderson*, 477 U.S. at 252. However, "[c]redibility judgments and weighing of the evidence are prohibited during the consideration of a motion for summary judgment." *Ahlers v. Scheibil*, 188 F.3d 365, 369 (6th Cir. 1999).

The moving party must make a *prima facie* showing that it is entitled to summary judgment, and it bears the burden of production. *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986). If the burden of persuasion at trial would be on the non-moving party, then the moving party can meet its burden of production by either: (1) submitting "affirmative evidence that negates an essential element of the nonmoving party's claim" or (2) demonstrating "to the court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Id.*

If the moving party meets its burden of production, then the non-moving party must point out specific facts in the record that create a genuine issue of material fact. *Zinn v. United States*,

885 F. Supp. 2d 866, 871 (N.D. Ohio 2012) (citing *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992)). The non-moving party must show "more than a scintilla of evidence to overcome summary judgment"; it is not enough to show that there is slight doubt as to material facts. *Zinn*, 885 F. Supp. 2d at 871 (quoting *Fulson*, 801 F. Supp. at 4). Moreover, the court does not have "a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989) (citation omitted)).

## V.    Discussion

Yona maintains three common law claims for relief against Harper: (1) negligence; (2) breach of contract; and (3) breach of fiduciary duty.[9] (ECF No. 1 at 11-13). Each of the claims for relief turns on whether Harper breached the Escrow Agreement by disbursing the remaining $300,000 of the Deposit before he received an authenticated insurance policy, as required in the Escrow Agreement.

### A.    Yona's Breach of Contract Claim for Relief

#### 1.    Harper Did Not Follow the Escrow Agreement's Unambiguous Condition Precedent to Disbursement

In its tenth claim for relief, Yona defends against Harper's motion for summary judgment and moves for summary judgment of its own by arguing that Harper failed to follow the expressed

---

[9] Yona alleges common law claims for relief, but Yona did not plead them specifically under any state's laws. In his motion for summary judgment, Harper points out that "the Escrow Agreement does not indicate whether it is governed by Nevada law or California law." (ECF No. 32 at 7). He concludes that the Court should apply Nevada law to the matter because Harper "acted as escrow agent in Nevada and the corpus, *i.e.*, the $450,000, was deposited into [Harper's] … client trust account" there. (ECF No. 32 at 7). In response, Yona stated that it did "not dispute Harper's contention that Nevada law governs the parties' dispute" (ECF No. 48 at 8, n. 2), and the parties have argued their claims under Nevada law ever since. Thus, the Court will apply Nevada law.

terms of the Escrow Agreement, which provided that "[u]pon the receipt of an authenticated insurance policy by [Harper] …, [Yona] …, and Yona's counsel …, [Harper] will release the remaining $300,000 USD of the Deposit from [his] trust account…" (ECF No. 1-2 at 2). Yona argues that Harper was not authorized to release the remaining $300,000 of the Deposit until that condition occurred. (ECF No. 48 at 10; ECF No. 51 at 11-12). Because it never occurred, Yona argues that Harper is liable to Yona for disbursing the $300,000.[10]

Under Nevada law, "the plaintiff in a breach of contract action [must] show (1) the existence of a valid contract, (2) a breach by the defendant, and (3) damage as a result of the breach." *Saini v. Int'l Game Tech.*, 434 F. Supp. 2d 913, 919-20 (D. Nev. 2006); *Richardson v. Jones*, 1 Nev. 405, 408 (1865). Construction of a contractual term is a question of law. *NGA #2 Ltd. Liability Co. v. Rains*, 113 Nev. 1151, 1167 (1997). In interpreting a contract, "the court shall effectuate the intent of the parties, which may be determined in light of the surrounding circumstances if not clear from the contract itself…" *Id.* (citing *Davis v. Nevada National Bank*, 103 Nev. 220, 223, 737 P.2d 503, 505 (1987)).

This dispute focuses on the disbursement provision, which contains a condition precedent to disbursement: receipt of the insurance policy. (ECF No. 1-2 at 2). "A condition precedent to an obligation to perform calls for the performance of some act after a contract is entered into, upon which the corresponding obligation to perform immediately is made to depend." *NGA #2 Ltd. Liability Co.*, 113 Nev. at 1158-59 (quoting *New Orleans v. Texas & Pac. Railway*, 171 U.S. 312,

---

[10] Yona demanded $450,000 from Harper under claims for relief nine, ten, and eleven. (ECF No. 1 at ¶¶76, 80, 84). The Court notes, however, that Yona never asserts that Harper breached the Escrow Agreement by disbursing the initial $150,000 to Revilo's on July 18, 2018. Instead, Yona claims that Harper breached the Escrow Agreement only by disbursing the remaining $300,000 to FGI on July 26, 2018. Thus, Yona's potential remedy against Harper, if any, would be only $300,000.

333 (1897)). "Where the escrow agreement specifies a definite [provision] … for performance, performance must be made [as required by] … the agreement, and the escrow agent is without power to" deviate from the agreement. *Id.* at 1159.

The parties agree that the Escrow Agreement is a valid contract; they disagree on whether Harper breached its terms. Harper argues that the condition precedent to disbursement was ambiguous because Harper "would not know … what constitutes an 'authenticated insurance [p]olicy.'"[11] (ECF No. 53 at 12). But this dispute does not turn on the quality or authenticity of the insurance policy itself; rather, it turns on Harper's decision to disburse the remaining $300,000 before he received an insurance policy. In that light, Harper's ambiguity argument is unavailing, as the disbursement provision's condition precedent is not on its face ambiguous: Harper could not disburse the remaining portion of the Deposit until he, Yona, and Yona's counsel each received a copy of an authenticated insurance policy. (ECF No. 1-2 at 2-3).

The parties agree that Harper did not receive an authenticated insurance policy before disbursing the remaining $300,000 of the Deposit. Indeed, the parties agree that Harper disbursed the remaining funds solely because of Harper's communications with Weiss on July 26. (ECF No. 32 at 14-15; ECF No. 51 at 11). Thus, Harper failed to follow a material term of the Escrow Agreement as it was originally written.

---

[11] Harper also outlines a construed-against-the-drafter argument for this portion of the Escrow Agreement, noting that Yona supplied the contract's terms and operative language. (ECF No. 53 at 11; ECF No. 48 at 2 (citing Harper's Deposition)). Harper neglects to mention, however, that the Escrow Agreement was issued on his own letterhead and that he apparently suggested that Yona draft the operative terms for him. (ECF No. 48 at 2 (citing Harper's Deposition)). For the forthcoming reasons, though, it is immaterial to the overall disposition of this case whether Harper or Yona drafted the Escrow Agreement's terms.

## 2.    Yona and Harper Modified the Escrow Agreement

Despite this conclusion, Harper argues that he is not liable to Yona because Weiss, acting on Yona's behalf, authorized Harper to disburse the funds before Harper received the insurance policy.[12] (ECF No. 32 at 5; ECF No. 53 at 13). In other words, Harper argues that he is relieved from complying with the expressed terms of the Escrow Agreement because he and Weiss mutually modified the disbursement provision. (ECF No. 50 at 8). In that light, Harper argues that "he did as [he was] ordered"; thus, "[t]here can be no breach" because he "was merely following" the new agreement. (ECF No. 32 at 9).

Yona disagrees, stating that "it is beyond dispute that the Escrow [Agreement] … w[as] not amended to reflect that funds were to be disbursed before the insurance policy was secured." (ECF No. 51 at 11). Yona further states that "[t]he Escrow Agreement did not provide that Harper could release the funds based on a verbal confirmation from Mr. Weiss (even if that happened, as Mr. Weiss says it did not) or upon a convoluted and unclear email exchange." (ECF No. 51 at 12). Yona supports this position with an affidavit from Weiss, wherein he states that he never "authorize[d] Mr. Harper to release any escrowed funds in a manner contrary to the written Escrow Agreement" during either the July 26 WhatsApp call or the subsequent email exchange. (ECF No. 48-1 at 2-3). Weiss states that he "never authorized the funds to be released before the insurance was in place." (ECF No. 48-1 at 2-3).

---

[12] Yona has not asserted that Weiss *lacked* authority to bind Yona in this manner. It is well settled that attorneys have the authority to bind their clients "to such acts and agreements as are necessary for the due prosecution of the cause or business in connection with which [they] ha[ve] been employed." *Moore v. De Bernardi*, 47 Nev. 33, 34 (1923). Here, Weiss was employed for this transaction and negotiated the Escrow Agreement with Harper. (ECF No. 48-1 at ¶ 4; ECF No. 47-1 at 5-7). Thus, the Court concludes that Weiss was authorized to modify the Escrow Agreement on Yona's behalf.

17

Modification exists under Nevada law, as "[p]arties may mutually consent[13] to enter into a valid agreement to modify a former contract." *Clark County Sports Enterprises, Inc. v. City of Los Vegas*, 96 Nev. 167, 172 (1980). The "parties to a written contract who agree to new terms may orally modify the contract." *Jensen v. Jensen*, 104 Nev. 95, 98 (1988). "[C]onsent to a modification may be implied from conduct consistent with an asserted modification." *Id.* The evidence of a modification must be "clear and convincing." *Id.*

As a preliminary point, Yona argues that the parol evidence rule (which Nevada follows) bars the Court from admitting or relying on evidence that would vary or contradict a contract's unambiguous terms. (ECF No. 54 at 2-3). Indeed, Yona states that "no matter what was said or how Harper interpreted the email correspondence, the Court cannot consider any of it as evidence." (ECF No. 54 at 2). Not so: It is well settled that "[p]arol evidence may … be introduced to 'show subsequent oral agreements to rescind or modify a written contract.'" *Rudiak v. Matsumura*, No. 2:18-cv-02364, 2020 WL 5044133, at *3 (D. Nev. Aug. 25, 2020) (quoting *Silver Dollar Club v. Cosgriff Neon*, 389 P.2d 923, 924 (Nev. 1964)); *Jensen*, 104 Nev. at 98; *Clark County Sports Enterprises, Inc.*, 96 Nev. at 172. Thus, while the parol evidence rule precludes the Court from relying on outside evidence to discern the meaning of an unambiguous contract term, it does not

---

[13] The Court notes that, in addition to mutual assent, Nevada law, in certain circumstances, requires "additional consideration … to … modify the existing contract between the parties." *Wright v. Mecum Auctions Inc.*, No. 2:17-cv-02217, 2019 WL 1368572, at *2 (D. Nev. March 26, 2019) (ellipses in original) (quoting *Ins. Co. of the W. v. Gibson Tile Co.*, 134 P.3d 698, 703 (Nev. 2006) (*en banc*)). That rule appears to apply only if one party seeks additional compensation to perform what it already owed under the contract. *Zhang v. Eight Judicial Dist. Court of State ex rel. County of Clark*, 120 Nev. 1037, 1040-41 (2004). Thus, Nevada applies the "preexisting-duty rule," which serves to protect the party whose position has not changed from paying more for its original bargain by permitting that party to void the modification. *Id.* No fact indicates that that occurred here, though, and the parties have not raised this argument. Thus, the Court need not apply it.

preclude Harper's modification argument. Nor does the Escrow Agreement, as it does not prohibit modifications. (ECF No. 1-2 at 2).

The Court finds that Harper has met his burden of production for modification by submitting the email exchange as exhibits and stating as an affiant that they are authentic. (ECF Nos. 32, 32-1, 32-2, 32-3). Yona does not dispute the contents of those emails—in fact, Yona relied on them when deposing Harper. (ECF Nos. 47-4, 47-5, and 47-6). Those exhibits show that on July 26, 2018, Harper and Weiss both joined a WhatsApp call to discuss the transaction. (ECF No. 32 at 5; ECF No. 51-1 at ¶ 9). Harper thought that Weiss instructed Harper to immediately wire $25,000 of the Deposit, but that action did not line up with the Escrow Agreement, so Harper emailed Weiss to confirm what amount to wire and where to wire it. (ECF No. 32-2 at 21). Two minutes later, Weiss emailed back, "This confirms your authority to wire the funds under the agreement with Revilo's." (ECF No 32-2 at 21). Harper then asked for "wire instructions and [for Weiss to] confirm the amount" to be disbursed. (ECF No. 32-2 at 20). Samson Supreme then replied, asking Harper to "transfer the 300K with no delay." (ECF No. 32-2 at 20). Harper quickly replied, "Once … Weiss OK's [*sic*] it, I will head to the bank." (ECF No. 32-2 at 20). Samson Supreme replied, "I just re-emailed [Weiss's] … approval for you to do just that." (ECF No. 32-2 at 19). Harper reiterated that "[o]nce [Weiss] … confirms the amount, [he was] … set to go." (ECF No. 32-2 at 19). After Samson Supreme responded with the basic terms of the deal, Weiss returned to the conversation, writing back only "[c]onfirmed." (ECF No. 32-2 at 19). Samson Supreme then asked Harper to "provide a copy of the FED wire transfer receipt (to [his] email for [FGI's] banker)" (ECF No. 32-2 at 19), which Harper provided to Samson Supreme about an hour later. (ECF No. 32-2 at 15). Two minutes later, Samson Supreme wrote back directly to Harper, acknowledging the receipt. (ECF No. 32-2 at 15).

Yona attempts to meet its burden of producing evidence to dispute Harper's interpretation of the July 26 email exchange by submitting Weiss's affidavit. (ECF No. 48-1). In it, Weiss explains that he participated in the July 26, 2018 WhatsApp call, but that "at no point … did [he] authorize Mr. Harper to release any escrowed funds in a manner contrary to the written Escrow Agreement." (ECF No. 48-1 at ¶ 9). And concerning the emails, Weiss states that

> at no point did I authorize Mr. Harper to release any escrowed funds in a manner contrary to the written Escrow Agreement. In fact, I replied to an email from Mr. Harper stating 'This confirms your authority to wire the funds *under the agreement* with Revilo's. (emphasis added). I was expecting Mr. Harper to follow the terms of the written agreement. Further, when I replied subsequently and said 'confirmed,' I was merely confirming the details of the transaction, which involved securing an insurance policy *before* the funds were to be released. I never authorized the funds to be released before the insurance was in place. That would defeat the purpose of having insurance be a required part of the transaction.

(ECF No. 48-1 at ¶ 10 (emphasis and quotation marks in original)).

But even if considered in the light most favorable to Yona, the Court concludes that there is no *genuine* dispute of material fact concerning modification, as no reasonable jury could return a verdict for Yona. *Tokmenko*, 488 F. Supp. 3d at 576. The July 26 email exchange evinces modification by clear and convincing evidence. *Jensen*, 104 Nev. at 98. Indeed, the only reasonable way to interpret them is that Harper was to disburse the rest of the Deposit that day—or, as Samson Supreme put it, "without delay." (ECF No. 32-2 at 20). This is demonstrated by reading Weiss's words in context, rather than in isolation, as Yona asks the Court to do. In sending his first email, in which he wrote "[t]his confirms your authority to wire the funds under the agreement with Revilo's," Weiss cannot reasonably mean to authorize Harper to follow the Escrow Agreement's written terms because Harper was already authorized—in fact, obligated—to follow the Escrow Agreement. (ECF No. 1-2). Harper did not need Weiss to authorize him anew before he could

perform his fiduciary duty. Indeed, Harper had already performed his first and second duties under the Escrow Agreement—receiving Yona's $450,000, and disbursing the initial $150,000 to Revilo's—which Yona does not dispute here. Concerning Weiss's second email, in which he wrote only "[c]onfirmed" (ECF No. 32-2 at 19), Weiss cannot reasonably mean that he was confirming the Escrow Agreement's essential terms because Harper had asked Weiss specifically to "confirm" the timing of the disbursement, going as far as to state that he was "set to go," *i.e.*, "head to the bank" (as Harper had written just a few minutes before), once he received that confirmation. (ECF No. 32-2 at 19-20). In this light, Yona has failed to produce meaningful evidence to dispute the communications demonstrating that Harper and Yona mutually modified the Escrow Agreement's disbursement provision.

Yona's conduct after July 26, 2018, further evinces this conclusion. Five separate instances in the record reasonably demonstrated to Harper and the others in the transaction that Yona was pursuing Revilo's promise of a $20,000,000 funding allowance under the CPA, something that Yona could do only after Harper had released the full $450,000 Deposit. (ECF No. 1-2 at 2-3). First, in an August 8, 2018 email, Oliver wrote to Yona that "[e]verything is going well [with the investment,] and we are on track with the pay out [*sic*] schedule…" (ECF No. 32-2 at 5). Oliver references the payout schedule under the CPA, *i.e.*, the timeframe within which Revilo's was to perform. Revilo's would be "on track with the pay[]out schedule" under the CPA because Yona had fully invested in the venture. (ECF No. 1-2 at 2-3). Second, in its August 20, 2018 email to Harper, despite detailing the kind of insurance policy that was discussed in the Escrow Agreement, Yona never stated that Harper improperly released the funds on July 26, 2018, before he received the insurance policy. (*See* ECF No. 32-2 at 3-4). Third, in Yona's August 23, 2018 email to Oliver, Yona sought to determine the date on which the CPA had "incept[ed]," *i.e.*, when Revilo's 30-day

performance clock began to run under the CPA. (ECF No. 32-1 at 12). Indeed, Yona states that it "ha[d] assumed that it [incepted] … on July 17, 2018," which indicates that Yona knew that Revilo's was on the clock to perform. (ECF No. 32-1 at 12). Fourth, and as Harper reiterates, in Yona's September 4, 2018 email to Oliver, Weiss confirmed that the CPA was active because of Harper's July 26 disbursement. (ECF No. 32-1 at 28; ECF No. 50 at 9-10). There, Weiss wrote that

> Yona does not wish to terminate the [CPA]. However, unless [Yona] receive[s immediately] documentary proof that the funds taken from Mr. Harper's account were in fact used to pay for the insurance …, Yona will treat the [CPA] as terminated and insist on immediate payment of the funds deposited by Yona. If said funds are not returned within the time specified in the [CPA], [then Yona] will take all necessary steps to recover them…
>
> As we discussed, we do not count the first day, Thursday is the 30th banking day since Yona's funds were released from Mr. Harper's trust account on July 26, 2018. Under [Yona's] agreement with Revilo['s], Yona has the right to terminate its involvement [in this investment] and demand return of the $450,000 deposit at that time.

(ECF No. 32-1 at 28). Again, Yona never asserts that Harper improperly disbursed the remaining $300,000; instead, Yona sought to claw back its money only because Revilo's was unlikely to extend to Yona the $20,000,000 funding allowance that it had promised under the CPA. Fifth, in his September 25, 2018 email to Oliver, Weiss called Yona "investors" and reiterated that "the transaction was funded about 10 weeks ago[,] and the time to perform [under the CPA] ha[d] passed by over two weeks." (ECF No. 32-1 at 1). Weiss again demanded Revilo's performance, asking Oliver and Samson Supreme "explain to [Yona] directly the source of the delays [in extending to Yona its $20,000,000 funding allowance] and what is being done to work around" the delays. (ECF No. 32-1 at 1). Each of those instances evinces mutual modification to the disbursement provision.

At bottom, there is no *genuine* dispute of material fact that Weiss "[c]onfirmed" Harper's question as to whether to disburse the rest of the Deposit on July 26, 2018. Although Yona attempts to reinterpret the words that Weiss used in his July 26, 2018 emails, that reinterpretation rings hollow against Weiss's own words in those same emails. Moreover, Yona has not raised any question of fact that would refute Harper's assertion that Yona's post-disbursement conduct evinces modification. Yona's only submission to touch on this time period is Weiss's affidavit, in which he states that "[f]ollowing … Mr. Harper's transfer of the funds, [Yona] still retained hope and had the expectation that the insurance policy would be provided. In the days and weeks that followed[,] we made repeated demands [from Oliver] for the insurance policy, but never received it." (ECF No. 48-1 at ¶ 13). That statement accurately reflects Yona's August and September 2018 emails; it also generally endorses Harper's point that Yona's post-disbursement conduct further evinces mutual modification of the Escrow Agreement.

The Court concludes that Yona and Harper mutually modified the Escrow Agreement on July 26, 2018, such that Harper was to disburse the rest of the Deposit that day despite not receiving confirmation of an authenticated insurance policy. A reasonable jury could not find by a preponderance of the evidence that Yona did not modify the Escrow Agreement. *Anderson*, 477 U.S. at 252. Accordingly, Harper is not liable to Yona for breaching the Escrow Agreement's disbursement provision as it was originally drafted, as that provision no longer governed Harper's actions when Harper disbursed the rest of the Deposit.

### 3. Harper Properly Performed Under the Modified Escrow Agreement

Having concluded that the parties modified the Escrow Agreement's disbursement provision, the Court must next consider whether Harper breached the modified provision. As discussed above, the plaintiff in a breach of contract action [must] show (1) the existence of a valid

23

contract, (2) a breach by the defendant, and (3) damage as a result of the breach." *Saini*, 434 F. Supp. 2d at 919-20.

The Court concludes that Harper did not breach the modified disbursement provision. The modified provision compelled Harper to disburse the remaining $300,000 of the Deposit on July 26, 2018. Harper has demonstrated that he did so (ECF Nos. 32-1 at 34, 32-2 at 15) and that Yona acknowledged the disbursement. (ECF No. 32-1 at 28). Thus, there is no genuine dispute of material fact: Harper did not breach the Escrow Agreement's modified disbursement provision. Yona has thus failed to establish the existence of an essential element to its case on which it bears the burden at trial. *Celotex*, 477 U.S. at 322; Fed. R. Civ. P. 56(a). Accordingly, the Court grants summary judgment to Harper on claim for relief ten and denies summary judgment to Yona on claim for relief ten.

### B.       Yona's Breach of Fiduciary Duty Claim for Relief

Yona's eleventh claim for relief alleges a breach of fiduciary duty. Harper again argues that Weiss orally and in writing modified the Escrow Agreement on Yona's behalf and that Harper was merely following the modified instructions. (ECF No. 50 at 1). Thus, Harper argues that he is not liable to Yona under a breach of fiduciary duty theory.

For its part, Yona again focuses solely on the Escrow Agreement's written terms. (ECF No. 51 at 13). Yona argues that Harper "should have been 100% certain before he wired Yona's funds" because he is a fiduciary to Yona. (ECF No. 51 at 13). As with breach of contract, Yona argues that the July 26 email exchange did not clearly modify the Escrow Agreement; thus, Harper is liable for breaching his fiduciary duty.

"[A]breach of fiduciary duty claim seeks damages for injuries that result from the tortious conduct of one who owes a duty to another by virtue of the fiduciary relationship." *Stalk v.*

24

*Mushkin*, 125 Nev. 21, 28 (2009). "A claim for breach of fiduciary duty customarily has three elements: (1) existence of a fiduciary duty, (2) breach of the duty, and (3) damages as a result of the breach." *Guzman v. Johnson*, No. 79818, 483 P.3d 531 (Nev. 2021) (citing *Guilfoyle v. Olde Monmouth Stock Transfer Co.*, 130 Nev. 801, 812-13 (2014)). A "fiduciary relation exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." *Stalk v. Mushkin*, 125 Nev. 21, 28 (2009) (quoting RESTATEMENT (SECOND) OF TORTS § 874, cmt. a (1979)). An escrow agent must execute his or her duties with "scrupulous honesty, skill[,] and diligence." *Horner v. Semenza*, 129 Nev. 1123 (Table), 2013 WL 3257963, at *3 (May 31, 2013). In short, "[t]he agent must strictly adhere to the escrow agreement's terms." *Id.*

Harper has demonstrated that he is entitled to summary judgment on this claim for relief. Harper concedes that he was a fiduciary to Yona under the Escrow Agreement. (ECF No. 50 at 2). But as analyzed above, Yona and Harper mutually modified the Escrow Agreement's disbursement provision, and Harper disbursed the remainder of the Deposit under that provision without delay. (ECF No. 32-2 at 15). Harper thereby properly executed his duty as an escrow agent. *Horner*, 2013 WL 3257963, at *3. Yona has thus failed to establish the existence of an essential element to its case on which it bears the burden at trial. *Celotex*, 477 U.S. at 322; Fed. R. Civ. P. 56(a). Accordingly, the Court grants summary judgment to Harper on claim for relief eleven and denies summary judgment to Yona on claim for relief eleven.

### C.  Yona's Negligence Claim for Relief

In the ninth claim for relief, Yona alleges negligence. (ECF No. 1 at 11-12). "To prevail on a negligence theory, a plaintiff must generally show that: (1) the defendant owed a duty of care to the plaintiff; (2) the defendant breached that duty; (3) the breach was the legal cause of the

plaintiff's injury; and (4) the plaintiff suffered damages." *Scialabba v. Brandise Construction Co.*, 112 Nev. 965, 968 (1996). "Whether a defendant owes a plaintiff a duty of care is a question of law." *Id.*

Harper has again demonstrated that he is entitled to summary judgment. A negligence claim for relief raises the same elements as a breach-of-fiduciary-duty claim for relief with one added element: causation. As analyzed above, Harper has shown that he properly executed his fiduciary duty under the modified Escrow Agreement, *i.e.*, that he did not breach his duty of care. Yona has thus failed to establish the existence of an essential element to its case on which it bears the burden at trial. *Celotex*, 477 U.S. at 322; Fed. R. Civ. P. 56(a). Accordingly, the Court grants summary judgment to Harper on claim for relief nine and denies summary judgment to Yona on claim for relief nine.

**VI.     Conclusion**

For these reasons, the Court GRANTS summary judgment to Harper on claims for relief nine, ten, and eleven. The Court DENIES summary judgment to Yona on claims for relief nine, ten, and eleven.


        IT IS SO ORDERED.

DATED: May 3, 2021                                    */s/ Carmen E. Henderson*
                                                       Carmen E. Henderson
                                                       United States Magistrate Judge